MUSKOGEE COUNTY DISTRICT COURT
STATE OF OKLAHOMA

| | |
|---|---|
| LORENA SANCHEZ,<br>as SPECIAL ADMINISTRATOR to<br>BO MICHAEL GUTHRIE, deceased,<br><br>       Plaintiff,<br><br>v.<br><br>(1) BOARD OF COUNTY<br>    COMMISSIONERS OF MUSKOGEE<br>    COUNTY, *ex rel.*<br>(2) MUSKOGEE COUNTY SHERIFF'S<br>    OFFICE, and<br>(3) BRADLEY M. FULLER,<br>(4) EMMEY CAPPS,<br>(5) GARRETT BOYD, and<br>(6) KELSEY HALL, in their official and<br>    individual capacities,<br><br>       Defendants. | Case No. 21-CV-306-JEH<br><br>JURY TRIAL DEMANDED<br>ATTORNEY LIEN CLAIMED |

## FIRST AMENDED COMPLAINT

Plaintiff Lorena Sanchez ("Sanchez"), Special Administrator to Bo Michael Guthrie ("Guthrie" or "Decedent"), and Administrator of the Estate of Bo Michael Guthrie ("Decedent's Estate," collectively "Plaintiffs"), for her action against the Board of County Commissioners of Muskogee County, Oklahoma ("BOCC") *ex rel.* Muskogee County Sheriff's Office ("MCSO"), Deputy Bradley M. Fuller, and Muskogee County Jail employees Emmey Capps ("Capps"), Garrett Boyd ("Boyd"), and Kelsey Hall ("Hall"), hereby alleges as follows:

### PARTIES, JURISDICTION & VENUE

1. This action arises under the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 *et seq.*; 42 U.S.C. § 1983; U.S. Const., Amend. IV & XIV; Okla. Const, Art. 2 § 30; OKLA. STAT. tit. 12 § 1053, and the common law of the State of Oklahoma.

1

2. Plaintiff Lorena Sanchez is the sister of Bo Michael Guthrie, now deceased, and a resident of the Town of Wichita, Sedgwick County, State of Kansas.

3. On June 25, 2020, in Sedgwick County District Court of Kansas Case No. 2020-PR-000815-DE, sister, Lorena Sanchez was appointed Special Administrators of Decedent's Estate.

4. Defendant Board of County Commissioners of Muskogee County ("BOCC" or the "County") is a statutorily created governmental entity. 57 Okla. Stat. § 41 provides that "[e]very county, by authority of the *board of county commissioners* and at the expense of the county, *shall have a jail* or access to a jail in another county *for the safekeeping of prisoners lawfully committed*." (emphasis added). BOCC must discharge its responsibilities to the Muskogee County Jail in a constitutional manner.

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1343 to secure protection of and to redress deprivations of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. §1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

6. The jurisdiction of this Court is also invoked under 28 U.S.C. §1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

7. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

8. Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

9. On January 3, 2020, Bo Michael Guthrie was incarcerated at the Muskogee County Jail ("MCJ").

10. On the morning of January 3, 2020, Guthrie was sharing Cell #110 with Derek Martin Perez ("Perez"), an individual who was also incarcerated at MCJ.

11. According to the narrative statement provided by Chief Deputy Michael Mahan:

    At approximately 0805 hrs. both [Guthrie and Perez] were laying down in the cell, with Guthrie appearing to be asleep according to surveillance video.

    [Perez] then gets up and approached Guthrie and begins to hit him with his hands and then stomp him with his bare feet. The majority of the blows observed (in exces of twenty counting hand and foot blows) were to the head area. After the attack, [Perez] sits back down and Guthrie appears to be unconscious.

12. Mahan's narrative further indicates that "[t]he altercation was observed via video surveillance by Assistant Jail Administrator Lacy Rosson," who thereafter purportedly sent jail security to the location to remove Perez from Cell #110, and "E.M.S. was called to the scene to transport Guthrie to St. Francis Hospital in Muskogee."

13. Mahan's narrative goes on to say that "Guthrie was medically cleared to return to the jail later that same day."

14. According to Barrett Thomas Bradt, MD, Guthrie was discharged from St. Francis Hospital ("SFH") with "strict warnings as well as instructions to return to the emergency department immediately should [Guthrie] develop any new, worrisome, or worsening symptoms."

15. Guthrie also received the following instructions upon discharge from SFH:

    You have as head injury. … Most problems happen within the first 24 hours.

**WHEN SHOULD I GET HELP RIGHT AWAY?**
- You are confused or sleepy
- You cannot be woken up
- Your … unsteadiness is getting worse
- You cannot walk

During the next 24 hours after the injury, you must stay with someone who can watch you.  **This person should get help right away … if … you pass out or you are unable to wake up.**

**MAKE SURE YOU:**
- Will get help right away if you are not doing well or get worse.

16. Upon information and belief, Deputy Bradley Michael Fuller received the foregoing instructions regarding Guthrie's medical needs and the precautions that must be taken upon Guthrie's return to MCJ.

17. After he was released back to the Muskogee County Jail, Mr. Guthrie began exhibiting more signs of medical distress and indications that immediate medical attention was needed.

18. Among other things, according to jail records, Guthrie was unable to walk, was unconscious, could not be woken up, and had repeatedly pleaded with MCJ staff that he needed additional attention.

19. Mahan's narrative concludes:

    A few hours [after his arrival back at MCJ], Guthrie was transported by E.M.S. to St. Francis Hospital, Tulsa.  On 1-13-20 at approximately 1000 hrs., I was notified that Guthrie had died while in St. Francis Hospital, Tulsa.

20. Mahan's narrative provides no information whatsoever regarding the reason(s) why, "[a] few hours later," Guthrie needed to be "transported by E.M.S. to St. Francis Hospital."

21. On January 4, 2020, however, Dr. Bradt authored the following note providing the missing information:

> Upon arrival to my shift this morning, I was notified that [Guthrie] had returned back to the emergency department after I had initially seen him and discharged him back to jail. I did speak with the EMS crew that transported [Guthrie] from jail back to St. Francis Muskogee yesterday evening. They report that the patient sustained an additional traumatic injury after being taken back to jail, after being initially cleared from his first visit here yesterday morning. **[Guthrie] was reportedly assaulted again and also reportedly had a fall while in jail, both of which occurred after his initial visit yesterday morning.** This is also documented by the charge nurse in her note as seen in the medical record. **The patient has new traumatic injury** including a right parietal hematoma **that was not present upon his first visit here yesterday morning.** The patient's resulting injuries, as seen on imaging studies, including the new acute subdural hematoma to the left cerebral hemisphere occurred following **the additional assault that the patient sustained after he was taken back to jail after his initial visit yesterday morning.**

22. The State of Oklahoma Office of the Chief Medical Examiner performed an autopsy on Guthrie. Cheryl Niblo, D.O., determined that "[t]he cause of [Guthrie's] death is complications of left subdural hematoma," which were the result of the second assault on Guthie (after returning to MCJ late on the morning of January 3, 2020).

23. Niblo further concluded that "[t]he manner of death is classified as homicide."

24. Upon information and belief, Fuller, Reyes, Capps, Boyd, and Hall were aware of, but did not adhere to, the strict instructions governing Guthrie's release from SFH.

25. According to the incident report prepared by Assistant Jail Administrator Lacy Rosson ("Rosson"), upon returning to MCJ, Guthrie remained under observation for only "about an hour."

26. Specifically, Rosson stated:

    Inmate Guthrie returned from the hospital at approximately 1115. Inmate Guthrie stayed in intake so we could observe him after he returned from the hospital. After about an hour he was then taken to detox cell 110 by himself.

27. According to Rosson's statement:

5

> At approximately 1900 I received a phone call from Administrator Karolina Boulet that medical Kelsey Hall had checked on Inmate Guthrie and he had fallen in the call and she felt she needed to send inmate Guthrie back out to the hospital.

28. According to MCJ Supervisor Garrett Boyd:

> At approximately 1115 [Guthrie] returned from the hospital escorted by Deputy [Bradley Michael] Fuller. He was placed in intake while we fed lunch. … After feeding, me (sic) and maintenance Lonnie Hall … placed Guthrie in 110 [at which time] Inmate Guthrie could barely walk and seemed to be very discoherent mentally.

29. Boyd further stated:

> I'm unsure of the time, but [Courtney Clinton] was returning and S. Weisenfel came over the radio and said [Guthrie] was lying in the floor. I then entered detox with Deputy Reyes [and] then assisted Guthrie back up on the bench in the cell and returned to my normal dutys (sic). At approximately 1855 I'm unsure who was sittin[g] on main control but they notified us that [Guthrie] was in the floor yet again, and that he would not respond over the intercom. After entering cell 110 we found him laying very close to the door[;] his breathing was very shallow and he as not responding to any method of trying to get him to wake up.

30. According to MCJ records, the employee charged with checking on Guthrie every quarter hour was Emmey Capps.

31. Upon information and belief, Capps failed to check on Guthrie every quarter hour.

32. According to the investigative summary prepared by the Oklahoma State Bureau of Investigation ("OSBI"):

> At about 0800 hours, PEREZ was seen on camera standing atop of GUTHRIE'S bunk, kicking GUTHRIE in the head multiple times. GUTHRIE appeared unconscious on the bunk. Jailers entered the cell and GUTHRIE was not able to regain consciousness. EMS was called and GUTHRIE was transported to the hospital. GUTHRIE was treated at the hospital for a head injury and released back to the jail the same day.

33. According to the OSBI's narrative summary, after returning to the jail, Guthrie was put into a cell with no other inmates and, "[a]t about 1800 hours, on January 3, 2020, GUTHRIE was observed having trouble walking."

34. Upon information and belief, the second assault to which Guthrie was subjected was carried out by one or more of the above-named MCJ workers who came into contact with Guthrie upon his return to MCJ the morning of January 3, 2020.

35. Alternatively, upon information and belief, one or more of the above-named MCJ workers placed Guthrie back in a cell with Perez or another inmate prone to violent attacks.

36. MCSO has a long-standing culture and practice of disregarding its written policies. Its personnel have been affirmatively trained to engage in unnecessary and excessive force on arrestees and prisoners who pose no threat (including those fully restrained).

37. MCSO personnel have also been trained to maintain secrecy and/or falsify reports regarding such abuses.

38. On or about July 9, 2020, and pursuant to 51 O.S. § 156, Plaintiffs timely filed a Notice of Claim within one year of the date on which the loss occurred (i.e., approximately April 4, 2015), serving copies of the same on the office of the clerk for each of the following entities BOCC, Muskogee County Sheriff, and Muskogee County clerk and were notified by separate letter on February 20,2020 to preserve evidence surrounding this incident and of the impending potential tort claim.

## CAUSES OF ACTION
### CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND/OR FOURTEENTH AMENDMEENT(S) TO THE CONSTITUION OF THE UNITED STATES
### (42 U.S.C. § 1983)

39. The foregoing paragrpahs are incorporated herein by reference.

40. Mr. Guthrie's injuries and medical condition sharply and obviously deteriorated under the care of Defendants.

41. As a direct and proximate result of Defendants' conduct, Guthrie suffered damages and is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the Defendants' deprivation of his rights secured by the U.S. Constitution.

**WHEREFORE**, premises considered, Plaintiff Lorena Sanchez prays for judgment against Defendants for all available pecuniary and non-economic damages, as well as punitive damages (against the individual Defendants only), in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiffs anticipate will be presented in this case. Plaintiffs also pray for prejudgment interest, attorney fees, and the costs of this action, to be taxed against Defendants, along with an award of all other relief (whether legal, equitable, or both) to which Plaintiffs may be entitled and/or that the Court deems just and proper.

**Respectfully submitted:**

**GARRETT LAW**

D. Mitchell Garrett, OBA # 20704
320 South Boston Avenue, Suite 825
Tulsa, Oklahoma 74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
E-mail: Mitchell@garrettlawcenter.com

**Attorney for Plaintiff**