**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **LORENA SANCHEZ, as Special** | ) | |
| **Administrator of the ESTATE OF BO** | ) | |
| **MICHAEL GUTHRIE, deceased,** | ) | |
| | ) | **Case No. 21-CV-306-JEH** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| | ) | **ATTORNEY LIEN CLAIMED** |
| **(1)  MUSKOGEE COUNTY SHERIFF, in** | ) | |
| **his official capacity;** | ) | |
| **(2)  KAROLINA BOULET, individually** | ) | |
| **and in her official capacity as Muskogee** | ) | |
| **County Jail Administrator;** | ) | |
| **(3)  LACY ROSSON; individually** | ) | |
| **and in her official capacity as Muskogee** | ) | |
| **County Jail Assistant Administrator;** | ) | |
| **and** | ) | |
| **(4)  CHIEF DEPUTY MICHAEL MAHAN;** | ) | |
| **(5)  DEPUTY BRIAN REYES;** | ) | |
| **(6)  GARRETT BOYD;** | ) | |
| **(7)  LISA HOPE;** | ) | |
| **(8)  JOSEPH COLE;** | ) | |
| **(9)  EMMEY CAPPS;** | ) | |
| **(10) AUTUMN OWENS-SQUIRREL;** | ) | |
| **(11) SAMANTHA WEISNEFELS; and** | ) | |
| **(12) KELSEY HALL;** | ) | |
| **in their official and individual capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**SECOND AMENDED COMPLAINT**
**(CORRECTED)**

Plaintiff Lorena Sanchez ("Sanchez" or "Plaintiff"), as Special Administrator of the Estate

of Bo Michael Guthrie ("Guthrie" or "Decedent"), for her action against Muskogee County Sheriff

("MCS"), Muskogee County Jail Administrator Karolina Boulet ("Boulet"),  Muskogee County

Jail Assistant Administrator Lacy Rosson ("Rosson"), Chief Deputy Michael Mahan ("Mahan"),

Deputy Brian Reyes ("Reyes"), and Muskogee County Jail workers Garrett Boyd ("Boyd"), Lisa

Hope ("Hope"), Joseph Cole ("Cole"), Emmey Capps ("Capps"), Autumn Owens-Squirrel ("Owens-Squirrel), Samantha Weisenfels ("Weisenfels"), and Kelsey Hall ("Hall", collectively "Defendants"), hereby alleges as follows:

## PARTIES, JURISDICTION & VENUE

1. This action arises under 42 U.S.C. § 1983; the United States Constitution, Amendment XIV; OKLA. STAT. tit. 12 § 1053; and the Oklahoma Governmental Tort Claims Act, OKLA. STAT. tit. 51 § 151 *et seq.*; and the Oklahoma Constitution.

### Lorena Sanchez (Special Administrator of the Estate of Bo Michael Guthrie)

2. Plaintiff Lorena Sanchez in the sister of Bo Michael Guthrie, now deceased, and a resident of the Town of Wichita, Sedgwick County, State of Kansas.

3. On June 25, 2020, in Sedgwick County (Kansas) District Court Case No. 2020-PR-000815-DE, Sanchez was appointed as Special Administrator of the Estate of Bo Michael Guthrie (the "Estate") and was granted Letters of Special Administration authorizing her, *inter alia*, to prosecute the instant lawsuit.

### Muskogee County Sheriff / Muskogee County

4. Defendant Muskogee County Sheriff is the Sheriff of Muskogee County, Oklahoma, residing in Muskogee County, Oklahoma, and at all times relevant hereto, acting under color of state law.

5. Plaintiff's claims for relief in this *Second Amended Complaint* are brought against the Muskogee County Sheriff in his official capacity **only.**

6. "A claim against a government actor in his official capacity is essentially another way of pleading an action against the county … he represents." *Revilla v. Glanz*, 7 F.Supp.3d 1207, 1217 (N.D.Okla. 2014).

7.  Thus, Plaintiff suing MCS is the functional equivalent of suing Muskogee County. *Id.*; *Moran v. Unknown Nurse #1*, 2015 WL 9593622 *1 (N.D.Okla.) (holding "a suit against the sheriff in his official capacity is the same as naming the county"); *Lynch v. Bd. of County Comm'rs of Muskogee Co.*, U.S. Dist. Ct. (E.D.Okla.) Case No. 16-CV-247-JHP, Dkt. #22, p. 9 (in which the Board of County Commissioners of Muskogee County expressly conceded that MCS "does not enjoy a separate legal existence from Muskogee County").[1]

8.  Further, a county "may be held liable for an act it has officially sanctioned, **or** for the actions of an official with final policymaking authority." *Revilla v. Glanz*, 7 F.Supp.3d 1207, 1217 (N.D.Okla. 2014).

9.  The Muskogee County Sheriff is a county "official with final policymaking authority." *See id.* at 1218; *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995).

10. The Board of County Commissioners of Muskogee County ("BOCC") is the chief administrative body for Muskogee County ("County"), a political subdivision of the State of Oklahoma, with its principal place of business located in the City of Muskogee, Muskogee County, State of Oklahoma.

11. Pursuant to OKLA. STAT. tit. 57 § 41, "**Every county**, by authority of the board of county commissioners and at the expense of the county, **shall have a jail** or access to a jail in another county **for the safekeeping of prisoners** lawfully committed." (emphasis added).

12. The County must discharge its responsibilities to the Muskogee County Jail ("MCJ") in a constitutional manner.

---

[1]  In the event this Court finds otherwise, and determines that Plaintiff's claims against Muskogee County must be asserted by specifically naming the Board of County Commissioners of Muskogee County, Oklahoma (instead of naming the Muskogee County Sheriff), then Plaintiff would request leave to file a curative amendment.

13. Thus, BOCC is obligated to conduct itself in a constitutional manner with respect to any actions that it takes and/or responsibilities it discharges pertaining to MCJ.

14. At all times relevant hereto, MCS/County was responsible, *inter alia*, for providing medical supervision and services to Guthrie, and/or for taking all reasonable steps to ensure Guthrie's timely access to any necessary medical services, while he was incarcerated at MCJ or otherwise in its legal custody.

15. At all times relevant hereto, MCS/County was responsible, *inter alia*, for creating and implementing policies, practices, and protocols governing the provision of medical care to MCJ inmates and detainees (and those otherwise in its legal custody), and for training and supervising its employees in such regard.

**MCJ Administrator Karolina Boulet**

16. Defendant Karolina Boulet is, upon information and belief, a resident of Muskogee County, Oklahoma.

17. At all times relevant hereto, Boulet worked at MCJ and held the position of Administrator.

18. At all times relevant hereto, Boulet was acting under color of state law.

19. At all times relevant hereto, Boulet was responsible, *inter alia*, for overseeing Guthrie's health and well-being, for assuring the Guthrie's medical/health needs were met, for preventing Guthrie from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

**MCJ Assistant Administrator Lacy Rosson**

20. Defendant Lacy Rosson is, upon information and belief, a resident of Muskogee County, Oklahoma.

21. At all times relevant hereto, Rosson worked at MCJ and held the position of Assistant Administrator

22. At all times relevant hereto, Rosson was acting under color of state law.

23. During the time of the events upon which Plaintiff's claims for relief are based, Rosson was partially responsible, *inter alia*, for overseeing Guthrie's health and well-being, for assuring the Guthrie's medical/health needs were met, for preventing Guthrie from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

**Chief Deputy Michael Mahan**

24. Defendant Michael Mahan is, upon information and belief, a resident of Muskogee County, Oklahoma.

25. At all times relevant hereto, Mahan held the position of Chief Deputy and carried out the duties of such position (in whole or in part) at MCJ.

26. At all times relevant hereto, Mahan was acting under color of state law.

27. During the time of the events upon which Plaintiff's claims for relief are based, Mahan was partially responsible, *inter alia*, for overseeing Guthrie's health and well-being, for assuring the Guthrie's medical/health needs were met, for preventing Guthrie from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

**Garrett Boyd**

28. Defendant Garrett Boyd is, upon information and belief, a resident of Muskogee County, Oklahoma.

29. At all times relevant hereto, Boyd worked at MCJ as a detention officer.

30. At all times relevant hereto, Boyd was acting under color of state law.

31. During the time of the events upon which Plaintiff's claims for relief are based, Boyd was partially responsible, *inter alia*, for overseeing Guthrie's health and well-being, for assuring the Guthrie's medical/health needs were met, for preventing Guthrie from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

**Lisa Hope**

32. Defendant Lisa Hope is, upon information and belief, a resident of Muskogee County, Oklahoma.

33. At all times relevant hereto, Hope worked at MCJ as a detention officer.

34. At all times relevant hereto, Hope was acting under color of state law.

35. During the time of the events upon which Plaintiff's claims for relief are based, Hope was partially responsible, *inter alia*, for overseeing Guthrie's health and well-being, for assuring the Guthrie's medical/health needs were met, for preventing Guthrie from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

**Joseph Cole**

36. Defendant Joseph Cole is, upon information and belief, a resident of Muskogee County, Oklahoma.

37. At all times relevant hereto, Cole worked at MCJ as a detention officer.

38. At all times relevant hereto, Cole was acting under color of state law.

39. During the time of the events upon which Plaintiff's claims for relief are based, Cole was partially responsible, *inter alia*, for overseeing Guthrie's health and well-being, for

assuring the Guthrie's medical/health needs were met, for preventing Guthrie from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

**Brian Reyes**

40. Defendant Brian Reyes is, upon information and belief, a resident of Muskogee County, Oklahoma.

41. At all times relevant hereto, Reyes held the position of Deputy and carried out the duties of such position (in whole or in part) at MCJ.

42. At all times relevant hereto, Reyes was acting under color of state law.

43. During the time of the events upon which Plaintiff's claims for relief are based, Reyes was partially responsible, *inter alia*, for overseeing Guthrie's health and well-being, for assuring the Guthrie's medical/health needs were met, for preventing Guthrie from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

**Emmey Capps**

44. Defendant Emmy Capps is, upon information and belief, a resident of Muskogee County, Oklahoma.

45. At all times relevant hereto, Capps worked at MCJ.

46. At all times relevant hereto, Capps was acting under color of state law.

47. During the time of the events upon which Plaintiff's claims for relief are based, Capps was partially responsible, *inter alia*, for overseeing Guthrie's health and well-being, and for taking all reasonable steps within her power to assure the Guthrie's medical/health needs were met, to prevent Guthrie from being subjected to any unjustifiably high risk of harm

that is known and/or so obvious that it should be known, and to respond reasonably in the face of any such risk.

**Autumn Owens-Squirrel**

48. Defendant Autumn Owens-Squirrel is, upon information and belief, a resident of Muskogee County, Oklahoma.

49. At all times relevant hereto, Owens-Squirrel worked at MCJ.

50. At all times relevant hereto, Owens-Squirrel was acting under color of state law.

51. During the time of the events upon which Plaintiff's claims for relief are based, Owens-Squirrel was partially responsible, *inter alia*, for overseeing Guthrie's health and well-being, and for taking all reasonable steps within her power to assure the Guthrie's medical/health needs were met, to prevent Guthrie from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and to respond reasonably in the face of any such risk.

**Samantha Weisenfels**

52. Defendant Samantha Weisenfels is, upon information and belief, a resident of Muskogee County, Oklahoma.

53. At all times relevant hereto, Weisenfels worked at MCJ.

54. At all times relevant hereto, Weisenfels was acting under color of state law.

55. During the time of the events upon which Plaintiff's claims for relief are based, Weisenfels was partially responsible, *inter alia*, for overseeing Guthrie's health and well-being, and for taking all reasonable steps within her power to assure the Guthrie's medical/health needs were met, to prevent Guthrie from being subjected to any unjustifiably high risk of

harm that is known and/or so obvious that it should be known, and to respond reasonably in the face of any such risk.

**Kelsey Hall**

56. Defendant Kelsey Hall is, upon information and belief, a resident of Muskogee County, Oklahoma.

57. At all times relevant hereto, Hall worked as a nurse at MCJ.

58. At all times relevant hereto, Hall was acting under color of state law.

59. During the time of the events upon which Plaintiff's claims for relief are based, Hall was partially responsible, *inter alia*, for overseeing Guthrie's health and well-being, for assuring the Guthrie's medical/health needs were met, for preventing Guthrie from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

60. Upon information and belief, Defendants Boulet, Rosson, Mahan, Boyd, Hope, Cole, Reyes, Capps, Owens-Squirrel, Weisnefels, and Hall personally participated in the constitutional deprivations set forth by Plaintiff hereinbelow.

61. As such, Plaintiff is permitted to pursue claims under 42 U.S.C. § 1983 against each such Defendant in his or her capacity as an individual. *See generally Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976).

62. In addition, or in the alternative, to the allegations in ¶¶ 18, 22, 26, 30, 34, 38, 42, 46, 50, 54, and 58 that Defendants Boulet, Rosson, Mahan, Boyd, Hope, Cole, Reyes, Capps, Owens-Squirrel, Weisnefels, and Hall were acting under color of state law, such Defendants, or any them, acted outside the scope of his/her/their employment in by engaging in willful, wanton, intentional, malicious, and/or bad faith conduct that was a

proximate cause of Guthrie suffering physical injury and/or mental distress, the worsening of his condition, and/or his ultimate death.

63. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. §1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

64. The jurisdiction of this Court is also invoked under 28 U.S.C. §1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

65. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

66. Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## FACTS

67. On January 3, 2020, Bo Michael Guthrie was being held as a pretrial detainee at the Muskogee County Jail ("MCJ").

68. On the morning of January 3, 2020, Guthrie was sharing Cell #110 with Derek Martin Perez ("Perez"), an individual who was also incarcerated at MCJ.

69. According to the narrative statement provided by Chief Deputy Michael Mahan:

> At approximately 0805 hrs. both [Guthrie and Perez] were laying down in the cell, with Guthrie appearing to be asleep according to surveillance video.
>
> [Perez] then gets up and approached Guthrie and begins to hit him with his hands and then stomp him with his bare feet. The majority of the blows observed (in

excess of twenty counting hand and foot blows) were to the head area.  After the attack, [Perez] sits back down and Guthrie appears to be unconscious.

70.   Mahan's narrative further indicates that "[t]he altercation was observed via video surveillance by Assistant Jail Administrator Lacy Rosson," who thereafter purportedly sent jail security to the location to remove Perez from Cell #110, and "E.M.S. was called to the scene to transport Guthrie to St. Francis Hospital in Muskogee."

71.   Mahan's narrative goes on to say that "Guthrie was medically cleared to return to the jail later that same day."

72.   The investigative summary prepared by the Oklahoma State Bureau of Investigation ("OSBI") provides a similar account:

> At about 0800 hours, PEREZ was seen on camera standing atop of GUTHRIE'S bunk, kicking GUTHRIE in the head multiple times.  GUTHRIE appeared unconscious on the bunk.  Jailers entered the cell and GUTHRIE was not able to regain consciousness.  EMS was called and GUTHRIE was transported to the hospital.  GUTHRIE was treated at the hospital for a head injury and released back to the jail the same day.

73.   According to Barrett Thomas Bradt, MD, Guthrie was discharged from St. Francis Hospital ("SFH") with "**strict** warnings as well as **instructions to return to the emergency department immediately** should [Guthrie] develop any new, worrisome, or worsening symptoms." (Emphasis added)

74.   SFH also provided the following written instructions when discharging Guthrie on the morning of January 3rd:

> You have as head injury. … **Most problems happen within the first 24 hours**.
>
> **WHEN SHOULD I GET HELP RIGHT AWAY?**
> -   You are **confused** or **sleepy**
> -   You **cannot be woken up**
> -   Your … **unsteadiness** is getting worse
> -   You **cannot walk**

11

> During the next 24 hours after the injury, you must stay with someone who can watch you. **This person should get help <u>right away</u> … if … you pass out or you are unable to wake up.**
>
> **MAKE SURE YOU:**
> -   Will get help **right away** if you are **not doing well <u>or</u>** get **worse**.

(Emphasis added)

75.   Upon information and belief, SFH alterted Deputy Bradley Michael Fuller that it had prepared discharge instructions regarding Guthrie's specific medical needs and the precautions that must be taken upon Guthrie's return to MCJ.

76.   At 11:55 a.m. on January 3, 2020, MCJ Medical Supervisor Ellen Arnold, RN ("Arnold") acknowledged in writing that she had received a copy of the above-referenced SFH discharge instructions.

77.   The *Clinical Note* that Arnold prepared on January 3rd upon Guthrie's return from SFH stated, in pertinent part:

> I observed [Guthrie] on bench in intake.  I asked main control to keep a close eye on him + if there were any behavioral **Δ**s, ↓ LOC or N/V to notify.

78.   Upon information and belief, as used in Arnold's January 3rd *Clinical Note*, "**Δ**s" refers to changes.

79.   Upon information and belief, as used in Arnold's January 3rd *Clinical Note*, " ↓ LOC" means decrease in level of consciousness.

80.   Upon information and belief, as used in Arnold's January 3rd *Clinical Note*, "N/V" means nausea or vomiting.

81.   After his return to MCJ from SFH, Guthrie started to exhibit alarming behavioral changes, new and increased signs of medical distress, and outwardly apparent indications that he was in need of immediate medical attention.

82. Among other things, within the first hour following his return to MCJ, Guthrie's gait became unsteady, then rapidly progressed into an almost total inability to walk; he became increasingly confused and "very discoherent mentally," and began repeatedly pleading with MCJ to get him seen by a doctor right away.

83. From approximately 12:15 p.m. on, the worsening of Guthrie's condition accelerated to the point where he was requiring assistance with the simplest of tasks (*e.g.,* sitting up, drinking from a cup, getting up from the floor of his cell to sit on a bench, etc.).

84. Almost immediately after Guthrie was placed back into Cell 110 -- and nearly a full seven hours before making any attempt whatsoever to summon medical aid or otherwise alert medical personnel -- MCJ workers observed that Guthrie was no longer ambulatory and was increasingly unresponsive. As the afternoon progressed, they repeatedly discovered and otherwise observed Guthrie on the floor of his cell unconscious, in a decorticate posture, unresponsive to stimuli, and ultimately unable to be awakened.

85. The "decorticate posture" -- a telltale sign of severe brain damage -- is an abnormal, rigid posturing of one's body characterized by clenched first, arms that are bent in towards the body and held near the chest, and legs that are stiffly held out straight.

86. Despite these clear, dire signs, none of the MCJ detention officers or medical personnel abided by Dr. Bradt's "strict warning" and instructions "to return [Guthrie] to the emergency department immediately," or otherwise provided or summoned any medical aid for Guthrie.[2]

---

[2]     Plaintiff need not allege or prove a complete denial of care in order to plausibly allege or establish deliberate indifference. *See, e.g., Oxendine v. Kaplan,* 241 F.3d 1272, 1277 & n. 7 (10th Cir. 2001) (reversing summary judgment for defendants on deliberate indifference claim and rejecting government's argument that it was "dispositive … that [plaintiff] received at least some treatment from [a doctor] during the time period when he alleged that he received inadequate and delayed medical care."); *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999) ("[T]he fact that

87.   Likewise, upon information and belief, MCJ detention officers and medical personnel failed to follow SFH's instructions that upon discharge, Guthrie be kept under close and constant observation until approximately 8:00 a.m. on January 4th (*i.e.*, for the twenty-four (24) hours immediately following his injury).

88.   According to the incident report prepared by Assistant Jail Administrator Lacy Rosson ("Rosson"), upon returning to MCJ, Guthrie remained under observation for only "about an hour."

89.   Specifically, Rosson stated:

> Inmate Guthrie returned from the hospital at approximately 1115. Inmate Guthrie stayed in intake so we could observe him after he returned from the hospital. After about an hour he was then taken to detox cell 110 by himself.

90.   MCJ Supervisor Garrett Boyd noticed a deterioration in Guthrie's condition between the time that Guthrie returned to MCJ from SFH (at approximately 11:15 a.m.) and when Guthrie was moved from intake back into Cell 110 (approximately one hour later).

91.   According to the *Incident Report* prepared by MCJ Supervisor Garrett Boyd:

> At approximately 1115 [Guthrie] returned from the hospital escorted by Deputy [Bradley Michael] Fuller. He was placed in intake while we fed lunch. ... After

---

[plaintiff]has seen numerous doctors [does not] necessarily mean that he received treatment for serious medical needs, *i.e.*, that treatment was prescribed at all or that prescribed treatment was provided"); *see also McElligott v. Foley,* 182 F.3d 1248 (11th Cir. 1999) (holding there was sufficient evidence to demonstrate doctor and nurse's deliberate indifference to inmate's pain, despite some care being provided); *Young v. City of Augusta, Ga. Through DeVaney,* 59 F.3d 1160, 1170, 32 Fed. R. Serv. 3d 1438 (11th Cir. 1995) (although plaintiff received some treatment and medications, **gaps** in chart and other evidence raised triable issues regarding undue delay in providing treatment and provision of medications as prescribed); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir. 1994) (holding that a jury must resolve whether defendant provided inadequate treatment, and that deliberate indifference could be inferred from facts indicating that surgery had been required);*Durmer v. O'Carroll,* 991 F.2d 64 (3rd Cir. 1993) (plaintiff was seen by doctor and referred to specialists, but deliberate indifference was demonstrated by defendant's failure to provide plaintiff with physical therapy); *Waldrop v. Evans,* 871 F.2d 1030, 1033 (11th Cir. 1989) (in a case involving failure to give adequate psychiatric care, the court held that "grossly incompetent or inadequate care," or a decision by medical personnel "to take an easier and less efficacious course of treatment" would constitute a violation).

feeding, me (sic) and maintenance Lonnie Hall ... placed Guthrie in 110 [at which time] Inmate **Guthrie could barely walk** and seemed to be very discoherent mentally.

(Emphasis added)

92. The OSBI's narrative summary likewise noted that "GUTHRIE was observed [by MCJ workers] having trouble walking."

93. According to the *Incident Report* prepared by MCJ employee Lisa Hope, within the first hour after his return to MCJ from SFH, Guthrie became "confused[,] even trying to stand while he was cuffed to the bench."

94. Hope's *Incident Report* further indicates that as the first hour after his return to MCJ from SFH progressed, Guthrie "kept saying 'I haven't been seen' and 'I need to be seen,'" and otherwise indicated that he needed and was requesting further medical treatment.

95. According to her *Incident Report*, Hope replied by "repeating that [Guthrie already] had been seen at the hospital," denying Guthrie's requests for additional medical treatment.

96. Hope's *Incident Report* goes on to state that after being moved back into Cell 110, Guthrie was verbally unresponsive and "required assistance to sit up to drink and we had to hand him his cup."

97. According to Hope, it was apparent to her as the day progressed that there had been no improvement at all in Guthrie's confused state.

98. Hope's *Incident Report* abruptly concludes as follows:

Eventually medical was called to access (sic) him again because he was unresponsive **again**.  EMS was called and he was transported to the hospital.

(Emphasis added)

99. Hope's *Incident Report* provides no information whatsoever as to what may have caused Guthrie to become "unresponsive again."

15

100. Similarly, the narrative statement provided by Chief Deputy Michael Mahan abruptly concludes:

> Guthrie was medically cleared to return to the jail later [on the morning of January 3, 2020]. A few hours [after his arrival back at MCJ], Guthrie was transported by E.M.S. to St. Francis Hospital, Tulsa. On 1-13-20 at approximately 1000 hrs., I was notified that Guthrie had died while in St. Francis Hospital, Tulsa.

101. Mahan's narrative contains a conspicuous gap, providing no information whatsoever regarding the reason(s) why, "[a] few hours later," Guthrie needed to be "transported by E.M.S. to St. Francis Hospital."

102. Similarly, the narrative portion of the *Incident Report* prepared by MCJ Assistant Administrator Lacy Rosson concludes as follows:

> **At approximately 1900** I received a phone call from Administrator Karolina Boulet that medical **Kelsey Hall had checked on Inmate Guthrie and he had <u>fallen</u> in the cell** and she felt she needed to send inmate Guthrie back out to the hospital. After reviewing cameras **from the incident <u>at 0805</u>**, from the time it happened until the time the DO's came into the cell was **08:05:15 to 08:06:13**.

(Emphasis added)

103. There is absolutely no indication from Rosson's *Incident Report* that she ever reviewed any video footage of Guthrie taken **after** his return from SFH.

104. Neither does Rosson's *Incident Report* provide an explanation for Rosson's evident failure to review any video footage of Guthrie taken **after** his return from SFH.

105. In that regard, Rosson's *Incident Report* contains no indication that she independently confirmed (by "reviewing cameras" or otherwise) that Guthrie had fallen after being placed back into Cell 110 on the afternoon of January 3rd.

106. Likewise, Rosson's *Incident Report* contains no indication that she independently investigated (by "reviewing cameras" or otherwise) any other potential causes of the

additional injuries Guthrie suffered after he arrived back to MCJ from SFH on January 3, 2020.

107. On January 4, 2020, however, Dr. Bradt began filling the above-referenced informational gaps when he authored the following note:

> Upon arrival to my shift this morning, I was notified that [Guthrie] had returned back to the emergency department after I had initially seen him and discharged him back to jail. I did speak with the EMS crew that transported [Guthrie] from jail back to St. Francis Muskogee yesterday evening. They report that the patient sustained an additional traumatic injury after being taken back to jail, after being initially cleared from his first visit here yesterday morning. **[Guthrie] was reportedly assaulted again and also reportedly had a fall while in jail, <u>both of which</u> occurred <u>after</u> his initial visit yesterday morning.** This is also documented by the charge nurse in her note as seen in the medical record. **The patient has <u>new traumatic injury</u> including a right parietal hematoma that was not present upon his first visit here yesterday morning.** The patient's resulting injuries, as seen on imaging studies, including the new acute subdural hematoma to the left cerebral hemisphere occurred following **the additional assault that the patient sustained after he was taken back to jail after his initial visit yesterday morning.**

(Emphasis added)

108. According to SFH records prepared by Sheri Kiser, RN, regarding the medical care she administered at approximately 8:14 p.m. on the evening of January 3rd:

> **[Guthrie] was seen earlier today for an assault. [Guthrie] was <u>returned to jail</u> and <u>was assaulted again</u>.** [Guthrie] was found down by workers, **unknown down time**, [and] on EMS arrival [Guthrie] was in cell unresponsive[.]

(Emphasis added)

109. The notion that Guthrie was assaulted again after returning to MCJ from SFH is supported by the *Incident Report* prepared by MCJ worker Trent Ailey.

110. In particular, according to Ailey's written description of events, he "responded to a call down in Detox Cell 110" on "1-3-20 [at] **18:35**". (Emphasis added)

111.  Ailey then recounts how after he "entered the cell to find Guthrie unresponsive on the floor" at 6:35 in the **evening** on January 3rd, he "**[r]emoved <u>Perez</u>** & placed him on the bench restrained, then waited by Cell 110 for EMS to arrive." (Emphasis added)

112.  Evidence that Guthrie was subjected to a second assault after his return to MCJ on January 3rd is also contained in the OSBI's summaries of its interviews of Brian Lewis and Vanessa Braden, both of whom were working for the Muskogee County Emergency Medical Service in January 2020.

113.  The OSBI's summary of the Lewis interview states, in pertinent part:

> LEWIS was working on January 3, 2020.  LEWIS recalled getting called to the Muskogee County Jail during the evening of January 3, 2020.  Upon arrival at the jail, LEWIS observed a male inmate on the cell floor.  The male was unclothed and **showed signs of head trauma**.  LEWIS observed a hematoma on the right side of the inmate's head.  While being transported, the inmate experienced seizures consistent with **traumatic brain injury**.
>
> *   *   *
>
> The inmate was not alert and was unable to talk.  **There was no indication of who assaulted the inmate.  LEWIS was told <u>by jail staff</u> that the inmate <u>may have been assaulted again</u>** and the inmate had been suicidal.  LEWIS was told the inmate had been taken to the hospital earlier the same day.

(Emphasis added)

114.  Similarly, the OSBI's summary of the Braden interview states, in pertinent part:

> BRADEN was working on January 3, 2020.  BRADEN recalled getting called to the Muskogee County Jail for an altered mental status call.  The call came in about 1930 or 2000 hours.  Upon arrival at the jail, BRADEN spoke with a nurse in the jail cell … [who] told BRADEN that the inmate, MICHAEL BO GUTHRIE, had gone to the hospital earlier in the day, but was medically cleared back to the jail. … [The nurse] stated **someone had <u>assaulted GUTHRIE again</u> when GUTHRIE came back to the jail**.
>
> When BRADEN arrived in the jail cell, GUTHRIE was face down, stiff, cold, and naked.  There was a towel covering up the buttocks of GUTHRIE.  GUTHRIE was not moving and not really breathing.

18

(Emphasis added)

115. The OSBI's interview with MCJ nurse Kelsey Hall reveals that Hall was working on the evening of January 3, 2020, that she "was present in the cell when emergency services arrived for MICHAEL GUTHRIE," that "[n]o other nurses were in the cell," and that she was the one who had "told the emergency personnel that GUTHRIE had been assaulted earlier in the day and then released back to the jail from the hospital."

116. During her interview with the OSBI, however, Hall denied "tell[ing] emergency personnel that GUTHRIE had been assaulted a second time because [Hall purportedly] knew GUTHRIE had been housed in a cell by himself away from other inmates."

117. Hall's statements to the OSBI are inconsistent with the version of events the EMS workers Lewis and Braden provided to the OSBI.

118. Hall's statements to the OSBI also fail to explain how Ailey could have "removed Perez" from Cell 110 if, as Hall claims, Guthrie "had been housed in [Cell 110] by himself away from other inmates."

119. The State of Oklahoma Office of the Chief Medical Examiner performed an autopsy on Guthrie.  Cheryl Niblo, D.O., determined that "[t]he cause of [Guthrie's] death is complications of left subdural hematoma."

120. This left subdural hematoma, in turn, was the result of a subsequent, separate assault on Guthrie that occurred sometime after he returned to MCJ from SFH late in the morning on January 3, 2020.

121. Indeed, according to the results of the CT scan of Guthrie's head performed at 7:59 p.m. on the evening of January 3rd, a "[n]ew large left-sided subdural acute hyperdense hematoma has formed since the prior negative examination this morning."

122. Dr. Niblo concluded that "[t]he manner of [Guthrie's] death is classified as homicide."

123. Upon information and belief, Boyd, Hope, Cole, Reyes, Capps, Owens-Squirrel, Hall, Boulet, Rosson, and Mahan possessed actual knowledge (or were otherwise aware or should have known) of, but consciously chose not adhere to, the strict instructions governing Guthrie's discharge from SFH.

124. Likewise, upon information and belief, Boyd, Hope, Cole, Reyes, Capps, Owens-Squirrel, Hall, Boulet, Rosson, and Mahan possessed actual knowledge (or were otherwise aware or should have known) of, but consciously chose not adhere to, Nurse Arnold's directive that a close eye be kept on Guthrie, and that Arnold be notified upon **any** changes to Guthrie's behavior or decrease in his level of consciousness.

125. Among other things, prior to the arrival of EMS at approximately 7:00 p.m. on January 3rd, neither Boyd, Hope, Cole, Reyes, Capps, Owens-Squirrel, Hall, Boulet, Rosson, or Mahan notified MCJ Medical Supervisor Ellen Arnold of the deterioration in Guthrie's condition.

126. In that regard, the *Medical Visit Log* prepared by Kelsey Hall indicates that Nurse Arnold was only notified of Guthrie's deteriorating state **after** "EMS showed up at approximately 1900".

127. Boyd further stated:

> I'm unsure of the time, but [Courtney Clinton] was returning and S. Weisenfel came over the radio and said [Guthrie] was lying in the floor.  I then entered detox with Deputy Reyes [and] then assisted Guthrie back up on the bench in the cell and returned to my normal duties (sic).  At approximately 1855 I'm unsure who was sittin[g] on main control but they notified us that [Guthrie] was in the floor yet again, and that he would not respond over the intercom.  After entering cell 110 we found him laying very close to the door[;] his breathing was very shallow and he as not responding to any method of trying to get him to wake up.

128. Upon information and belief, Emmey Capps, Lacy Rosson, Autmun Ownes-Squirrel, and Samantha Weisenfels were four of the employees charged with keeping Guthrie under

constant supervision after his return to MCJ from SFH on January 3, 2020 (at approximately 11:15 a.m.) until twenty-four (24) hours had lapsed from the time of his initial injury (*i.e.*, until approximately 8:00 a.m. on January 4, 2020).

129. Upon information and belief, according to MCJ records, Emmey Capps, Lacy Rosson, Autmun Ownes-Squirrel, and Samantha Weisenfels were four of the employees charged with checking on Guthrie every quarter hour upon his return to MCJ from SFH on January 3, 2020.

130. Upon information and belief, Capps, Rosson, Owens-Squirrel, and Weisnefels failed to keep Guthrie under constant supervision after his return to MCJ from SFH on January 3, 2020 (at approximately 11:15 a.m.) until twenty-four (24) hours had lapsed from the time of his initial injury (*i.e.*, until approximately 8:00 a.m. on January 4, 2020).

131. Upon information and belief, Capps, Rosson, Owens-Squirrel, and Weisnefels failed to check on Guthrie every quarter hour.

132. Upon information and belief, after Guthrie's return to MCJ from SFH on January 3, 2020 (at approximately 11:15 a.m.), fewer than one-hundred percent (100%) of the checks that Capps, Rosson, Owens-Squirrel, and Weisnefels collectively made on Guthrie were conducted in person (as opposed to remotely via audio and/or video link).

133. According to the OSBI's narrative summary, after returning to the jail, Guthrie was put into a cell with no other inmates."

134. Despite the foregoing, upon information and belief, one or more of the individual Defendants (excluding Hall) did, in fact, place Guthrie back in a cell with Perez (*i.e.*, the inmate who had brutally assaulted him earlier that morning) and/or another inmate or detainee prone to violent attacks.

135. Upon information and belief, one or more of the individual Defendants (excluding Hall) did, in fact, knowingly permit Guthrie to remain in a cell with Perez (*i.e.*, the inmate who had brutally assaulted him earlier that morning) and/or another inmate or detainee prone to violent attacks.

136. In particular, and as previously noted, Trent Ailey's *Incident Report* states that Ailey "responded to a call down in Detox Cell 110" on "1-3-20 [at] 18:35".

137. The *Incident Report* further states that after Ailey "entered the cell to find Guthrie unresponsive on the floor" at 6:35 in the **evening** on January 3rd, he "**[r]emoved Perez &** placed him on the bench restrained, then waited by Cell 110 for EMS to arrive." (Emphasis added)

138. Alternatively, upon information and belief, the second assault to which Guthrie was subjected was carried out by one or more of the above-named MCJ workers who came into contact with Guthrie sometime after his return to MCJ late morning on January 3, 2021.

139. According to the *Incident Report* prepared by Autumn Owens-Squirrel:

> At [approximately 6:45 p.m. on January 3, 2021], I was in Main Control **when I noticed [Garrett] Boyd and [Joseph] Cole at Cell 110** in DTX.  I went back to DTX to help.  When I arrived [Inmate] Guthrie was on the floor inside his cell close to the door.  … We noticed a small amount of blood coming form the back of [Guthrie's] head.

(Emphasis added)

140. Contrary to Owens-Squirrel's account, however, Boyd claims that it was "Main Control [who] notified [Boyd and Cole] that [Guthrie] was in the floor yet again, and that he would not respond [to Main Control] over the intercom."

141. MCS has a long-standing culture and practice of disregarding its written policies.

142.  MCS has a history of permitting and affirmatively training MCS/MCJ personnel to engage in unnecessary, unreasonable and excessive force on arrestees, detainees, prisoners, and inmates who pose no threat.

143.  MCS also has a long-standing culture, practice, and history of training MCJ personnel to maintain secrecy and/or to falsify reports regarding such abuses.

144.  MCS/MCJ has a long-standing culture, practice, and history of deliberate indifference toward the serious medical needs of arrestees, detainees, prisoners, and inmates (*e.g.,* delaying, denying, or otherwise interfering with the treatment of an inmate's serious medical needs despite being aware that such conduct would likely expose the inmate to a substantial risk of serious harm).

145.  Upon information and belief, the above-referenced history of deliberate indifference towards the serious medical needs of inmates resulted, in part, from overcrowding at MCJ (which MCS knowingly permitted and/or failed to abate).

146.  Prior to Janury 3, 2020, MCS/County had repeatedly been cited by the Oklahoma State Department of Health for overcrowding at MCJ (and related violations/deficiencies). **[*See, e.g.,* U.S. Dist. Ct. (E.D.Okla) Case No. 18-CV-171-JFH, Dkt. #169-28]**

147.  MCS/MCJ failed to take the necessary corrective action(s) to abate or otherwise adequately reduce overcrowding at MCJ.

148.  Upon information and belief, on January 3, 2020, the number of inmates housed at MCJ exceeded its legal capacity, which, in turn, played a part in Defendants' decision to place Guthrie and Perez in the same cell following Guthrie's return to MCJ from SFH earlier that day (despite the obvious, significant risks).

149. Defendants' failure to take reasonable measures to guarantee Guthrie's safety and well-being described hereinabove -- including their deliberate indifference to Guthrie's serious medical needs, their deliberate indifference in exposing Guthrie to the substantial risk of being brutally assaulted again by Perez (a risk which was significantly exacerbated by Guthrie's obviously weakened state), their failure to train and/or supervise MCJ detention officers and medical staff, and/or their use of constitutionally-excessive force -- proximately caused Guthrie to endure physical and mental pain and suffering, the worsening of his condition, and ultimately, his death.

150. The above-summarized acts and omissions were in furtherance of, and consistent with, the policies, customs, and practices that the MCS/County had previously created, implemented, observed, maintained, and/or tolerated (or in which MCS/County had otherwise previously acquiesced).

151. Whether formal or informal, the above-referenced policies, customs, and practices of MCS/County were well-settled and permanent.

152. There is a long and deep-seated history of an unabated custom of excessive force at MCJ.

153. For instance, on February 13, 2013, former MCJ Superintendent Raymond A. Barnes ("Barnes") and MCJ Assistant Superintendent Christopher A. Brown ("Brown") were indicted in this Court on several counts each of civil rights offenses related to excessive force used against multiple inmates/detainees. [*See* **Case No. 13-CR-017-RAW, Dkt. #3]**

154. Among other things, the indictment in Case No. 13-CR-017-RAW recounted the following:

> At all times relevant to this Indictment:
>
> 1. The Muskogee County Sheriffs Office ("the Sheriffs Office") was a law enforcement agency in Muskogee County, Oklahoma. Among other functions,

the Sheriffs Office operated the Muskogee County Jail ("MCJ") and guarded inmates detained at the MCJ. Employees of the Sheriffs Office were responsible for the well-being of inmates detained at the MCJ.

2. Employees of the Sheriffs Office who worked at MCJ are referred to hereafter as "jailers."

3. The MCJ houses inmates who: (1) have been convicted of state and federal crimes; (2) are awaiting transport to other nearby counties; (3) are awaiting trial; or (4) have been arrested on local charges and are awaiting appearance before a judge or pretrial officer.

## COUNT ONE
### [18 U.S.C. §241 - Conspiracy Against Rights]

On one or more occasions on or between August 2009 and May 2011, in Muskogee County, within the Eastern District of Oklahoma, defendants

### Raymond A. Barnes and Christopher A. Brown

along with others known and unknown to the Grand Jury, while acting under color of law, willfully combined, conspired, and agreed with each other, to injure, oppress, threaten, and intimidate inmates housed at the MCJ in the free exercise and enjoyment of rights and privileges secured to them by the Constitution of the United States.

### Objects of the Conspiracy

The objects of the conspiracy were to violate MCJ inmates' rights: (1) not to be deprived of liberty without due process of law and (2) not to be subjected to cruel and unusual punishment by one acting under color of law.

### Manner and Means of the Conspiracy

It was part of the manner and means of the conspiracy to unjustifiably strike, assault, harm, and physically punish inmates at MCJ who were restrained, compliant, and not posing a physical threat to anyone. [Barnes and Brown] would commit these acts themselves or direct other jailers employed at the MCJ to do so.

It was further part of the manner and means of the conspiracy that [Barnes and Brown] organized "Meet and Greets," whereby jailers would scare, punish, and harm incoming inmates from neighboring counties by throwing and slamming these handcuffed inmates to the ground upon their arrival at the MCJ.

It was further part of the manner and means of the conspiracy that [Barnes and Brown] would threaten to fire MCJ employees if they reported abusive behavior directly to the Sheriff or to outside law enforcement authorities.

It was further part of the manner and means of the conspiracy that [Barnes and Brown] required and encouraged MCJ jailers to write incident reports that falsely justified uses of force and contained misleading or inaccurate accounts of what had occurred when force was used.

It was further part of the manner and means of the conspiracy that [Barnes and Brown] perpetuated an environment within the MCJ that allowed unlawful beatings and assaults against inmates to continue indefinitely and without consequence.

Overt Acts

In furtherance of the conspiracy, and to affect the objects thereof, [Barnes and Brown] committed the following overt acts, among others, at the MCJ:

(a)   During or around August 2009, [Barnes and Brown] struck and beat an unidentified inmate who was restrained in a cell in the detox area and not posing a physical threat to anyone.

(b)   On or about March 26, 2010, [Barnes and Brown] orchestrated the "Meet and Greet" of inmate J.R. when the MCJ jailers threw and slammed J.R. onto the ground while J.R. was handcuffed and not posing a physical threat to anyone.

(c)   On or about June 24, 2010, [Barnes and Brown] orchestrated the "Meet and Greet" of inmate H.P. when the MCJ jailers threw and slammed H.P. onto the ground while H.P. was handcuffed and not posing a physical threat to anyone.

(d)   During or around June 2010, [Barnes and Brown] assaulted A.M., an inmate in the dayroom of the detox area who was not posing a physical threat to anyone.

(e)   On or about July 13, 2010, [Barnes] assaulted inmate J.A. while he was standing in the hallway outside of the medical area and not posing a physical threat to anyone.

(f)   On or about December 8, 2010, [Barnes and Brown] orchestrated the "Meet and Greet" of inmate G.T. when the MCJ jailers threw and slammed G.T. onto the ground while he was handcuffed and not posing a physical threat to anyone.

(g)   On or about May 4, 2011, [Barnes and Brown] orchestrated the "Meet and Greet" of inmate R.S. when the MCJ jailers threw and slammed R.S. onto the ground while he was handcuffed and and not posing a physical threat to anyone.

All in violation of Title 18, United States Code, Section 241.

155. At the close of the trial, the jury returned a verdict finding Barnes and Brown guilty, *inter alia*, of "conspiring to violate the rights of inmates" by assaulting them or directing other jailers to do so, and otherwise of "agree[ing] to deprive [MCJ] inmates of their right to be free from cruel and unusual punishment." *See U.S. v. Brown*, 654 Fed.Appx. 896, 902 & 909 (Fed.Appx. 2016).

156. The jury also found Brown guilty of "making a false statement to an FBI agent, in violation of 18 U.S.C. § 1001, by [falsely] stating that inmates were 'gently placed' on the ground during 'Meet and Greets.'" *See Brown*, 654 Fed.Appx. at 899.

157. In upholding Brown's conviction for "violation of an inmate's Eight Amendment rights," the Tenth Circuit found:

> We can infer malicious, sadistic intent from the conduct itself where "there can be no legitimate purpose" for the officers' conduct. Numerous witnesses testified that the inmates involved in the "Meet and Greets" were calm and in restraints, thus posing no threat … [which] suggests there was no legitimate purpose for Brown's conduct, which in turn suggests that he acted with malicious, sadistic intent.

*Brown*, 654 Fed.Appx. at 911.

158. The conduct of Barnes and Brown (who had been working as MCJ's Superintendent and Assistant Superintendent, respectively), is evidence of a widespread pattern and custom of unconstitutional misconduct, as well as of the clear and utter failure to train and supervise MCJ staff with respect to the proper use of force.

159. Upon information and belief, the pattern and custom of unconstitutional excessive force, and inadequate training and supervision, continued at MCJ following the indictment of Barnes and Brown.

160. For instance, a civil rights lawsuit was filed against Muskogee County on behalf of the Estate of Marvin A. Rowell, and was subsequently removed to this Court. **[*See* Case No. 18-CV-125-RAW]**   The *Third Amended Complaint* filed in that case has been summarized as follows:

> On January 30, 2016, Marvin Rowell was detained inside the Muskogee County jail. … Marvin was in handcuffs, but for reasons unknown, he was being escorted

by [Deputy Dakota West and Deputy Jacob Slay] to a "restraint chair." … [T]he decision to use the restraint chair was "unjustified and excessive." The supervisor of the deputy sheriffs [Lacy Rossen] was present, but she failed to prevent the deputies from moving Marvin to the restraint chair, which, was an act alleged to be "deliberately indifferent" to Marvin's rights. As Marvin was being escorted to the restraint chair, [Deputy West], "without provocation or justification ... forcibly handled [Marvin] by pushing him and/or causing or allowing him to fall." Marvin was seriously injured in the fall and later died from his injuries.

*Rowell v. Board of County Comm'rs of Muskogee Co.*, 485 P.3d 879, 881 (Okla.Civ.App. 2021).

161.   Further, according to the *Third Amended Complaint* in *Rowell*:

8.   [Deputy] West's willful, wanton, and malicious act [was carried out] in deliberate indifference to law and decedent's Constitutional rights[, and] caused Plaintiff to suffer damages[.] …

9.   [Deputy] Slay failed to prevent and/or acquiesced to [Deputy] West's decision to force decedent to the restraint chair, and subsequent use of excessive force. This conduct, when viewed in its totality and compared with reasonably accepted standards of conduct, … exhibit[ed] deliberate indifference to the Constitutional rights of decedent, intending to cause harm and deprive him of the civil liberties granted to him by the United States Constitution.

10.   … Defendant Lacy Rossen, who was the supervisor on duty at the Muskogee County Detention Center, failed to instruct and supervise [Deputies] Dakota West and Jacob Slay, and further failed to prevent … West and Slay [from] escort[ing] decedent to the restraint chair. This failure to control and supervise subordinates, when viewed in its totality and compared with reasonably accepted standards of conduct, … exhibit[ed] deliberate indifference to the Constitutional rights of decedent, intending to cause harm [to decedent] and deprive him of the civil rights granted to him by the United States Constitution.

11.   … Defendant Loyd Bickel, who was the Detention Center administrator for the Muskogee County Detention Center, was a policymaker and in such capacity, was responsible for training detention officers and ensuring that Detention Center employees complied with the constitutional rights of pretrial detainees. [Bickel's] failure to properly train, supervise and discipline [Deputies] West and Slay, when viewed in its totality and compared with reasonably accepted standards of conduct, [exhibited] deliberate indifference to the Constitutional rights of decedent, thereby depriving him of the civil rights granted to him by the United States Constitution.

28

12. [The Muskogee County] Board of County Commissioners' acquiescence and/or deliberate indifference to the adequacy of training and supervising [of] detention officers caused a custom or practice of unchecked constitutional violations and other wrongful behavior to develop throughout the Muskogee County Detention Center.

**[*See* Case No. 18-CV-125-RAW, Dkt. #2-17, pp. 3-4, ¶¶ 8-12]**

162. According to another lawsuit that was filed against Muskogee County, on March 22, 2017, MCJ inmate Daniel Thornburg was brutally beaten and attacked by three other inmates at the suggestion, request, and direction of Lonnie Hall, an employee of MCS who worked at MCJ. **[*See* Case No. 19-CV-087-SPS]**

163. According to the *Amended Complaint* in *Thornburg*:

2. Defendant Rob Frazier is the elected Sheriff of Muskogee County ["Defendant Sheriff "],and is personally charged with responsibility for: 1) the operation of the Muskogee County Jail [the "jail"]; 2) maintaining and insuring the health and safety of all persons in custody within the jail; 3) complying with all laws and regulations governing the jail, including without limitation the Constitutions of Oklahoma and the United States; 4) implementing policies, customs and practices to be followed by deputies and other jail employees; and 5) supervision of all personnel to ensure that all policies and procedures are followed.  19 O.S. §§ 510, *et seq*.

\*   \*   \*

6. Defendant Lonnie Hall ["Defendant Hall"] is upon information and belief a resident of Muskogee County, Oklahoma, and was at the relevant time employed by Defendants Sheriff and County as a jailer, detention officer or contract worker in the Muskogee County Jail.

\*   \*   \*

15. On or about March 22, 2017, Mr. Thornburg was arrested on suspicion of knowingly concealing stolen property and taken to the Muskogee County Jail for booking and pre- trial detention.

16. At least one of the employee/agents of the Muskogee County Jail, Lonnie Hall, had a long-standing grievance against Mr. Thornburg, whom Lonnie Hall believes participated in the murder of Ronnie Hall, upon information and belief, Defendant Hall's brother.

17. During the booking process, Mr. Thornburg told Defendant Hall and the jailers processing him, including without limitation Defendant Hall, that he

was in extreme fear for his safety at the jail because of Lonnie Hall's hostility and prior threats, and because of prior incidents in which Mr. Thornburg had been assaulted in the jail.

18.   Because of his fear, Mr. Thornburg specifically requested that he be held in the booking area pending the posting of bond, or in the alternative, that he be placed into protective custody.

19.   Defendant Hall and the jailers nearby ignored Mr. Thornburg's request and pleas, instead placing him directly into a locked common area of the jail with numerous other inmates, including inmates Christopher Eric Brazeal, Jim Dale Rowland, and Arthur Ryan Whiting[collectively, the "Assailants"].

20.   Shortly after being placed among other inmates, Mr. Thornburg was viciously attacked, beaten, stomped and kicked by the Assailants, causing severe physical and mental injuries from which he has yet to recover, and from which he may suffer for the rest of his life.

21.   Upon information and belief, the Assailants who attacked Mr. Thornburg did so at the suggestion, request and direction of Muskogee County Jail employee Hall.

22.   Assuming *arguendo* that Defendant Hall did not directly instigate the beating:

   a.   Defendant Hall and the jailers were aware that one or more of the Assailants held a grudge against Mr. Thornburg regarding an alleged assault by Mr. Thornburg upon a family member of one or more of the Assailants;

   b.   Defendant Hall and the jailers were grossly negligent, reckless, and deliberately indifferent to Mr. Thornburg's rights and safety when they needlessly placed him into a cell with known predatory inmates without taking reasonable and necessary steps to protect Mr. Thornburg from attack by the Assailants.

23.   As a direct and proximate result of the failure of Defendant Hall and the jailers to heed his pleas for safety and protection, Mr. Thornburg: 1) suffered and continues to suffer extreme pain and discomfort; 2) endured painful and invasive medical procedures; and 3) continues to be afflicted by lingering effects of the beating, including without limitation extreme pain and debilitating headaches.

24.   On and about March 22, 2017, Defendant Muskogee County Sheriff Rob Frazier managed the Muskogee County Jail under color of state law.

25.   On and about March 22, 2017, all employees of the Sheriff and the Muskogee

County Jail, including without limitation Defendant Hall, acted under color of law in relation to Mr. Thornburg.

**[Case No. 19-CV-087-RAW, pp. 1-4, ¶¶ 2, 6 & 15-25]**

164. In yet another civil rights lawsuit filed in this Court, it was alleged that in June 2015, a female inmate, Ashley Wayman, was physically assaulted by MCSO jailer, Harold Shinn.

**[*See* Case No. 17-CV-002-JHP]**

165. According to the *Complaint* in *Wayman*:

13. In early June 2015, plaintiff was housed in the Muskogee County Jail. …

14. At the time of plaintiff's confinement, defendant Shinn was a detention officer employed in the Muskogee County Jail.

15. Prior to defendant Shinn's employment as a detention officer, he had pled guilty to multiple felony offenses of burglary and was given a 5-year deferred sentence. Defendant Shinn's guilty pleas on these charges were in the public record and were known to [Muskogee County Sheriff Charles] Pearson, [Muskogee] County, and Muskogee County Sheriff's Department at the time defendant Shinn was hired as a detention officer.

16. In early June 2015, defendant Shinn took the plaintiff to the jail's medical unit for the routine administration of medication. Defendant Shinn was the sole detention officer on duty in the jail's medical unit on that day.

17. … The medical unit [at MCJ], and in particular the north side exam room, are unmonitored by any audio or visual surveillance equipment.

18. It is well known among inmates, jail detention staff, and [Sheriff] Pearson that the jail contains areas, including the medical unit, that are not monitored, thus creating "blind spots" within the jail where illegal and improper activity can take place without detection.

19. [Sheriff] Pearson has long known of illegal and improper activity … that has occurred in the Muskogee County Jail, and in particular in the "blind spots" within the medical unit.

20. Notwithstanding [Sheriff] Pearson's knowledge of illegal and improper sexual activity within the jail's medical unit and the absence of audio-visual monitoring in that unit, [Sheriff] Pearson routinely understaffed the medical unit with only a single male detention officer. Upon information and belief, [Sheriff] Pearson took no steps to add audio and/or visual monitoring or to increase the staffing level within the medical unit.

21.   On the day in question, defendant Shinn escorted the plaintiff from the female
pod onto the elevator to take her to the second floor medical unit.  Upon
entering the medical unit, defendant Shinn locked the door behind them and
began groping and kissing the plaintiff.  When the plaintiff began to protest,
defendant Shinn told her to shut-up and threatened her with "trouble" if she
said anything.

22.   Defendant Shinn took plaintiff into the north side exam room where the lights
were out.  In one move, defendant Shinn yanked off the plaintiff's sweat
pants, boxer shorts, and underwear.  He then removed his clothing and
forcibly pushed the plaintiff onto an examination table.  Defendant Shinn then
climbed on top of the plaintiff and forcibly raped her for about ten minutes.
After he was finished, defendant Shinn instructed the plaintiff to clean up and
shut up.

23.   About two days after the rape, defendant Shinn entered the female pod alone
after "lights out," reached up under the plaintiff's shirt, and began rubbing her
body in a sexual manner.  Plaintiff Wayman awoke to find defendant Shinn
stroking her torso.

24.   The Muskogee City-County Jail routinely houses both male and female
inmates. By routinely understaffing the jail's medical unit with only one
detention officer, [Sheriff] Pearson knew that female inmates in the medical
unit would frequently be left alone with male detention officers. With
defendant Pearson's knowledge of illicit sexual activity occurring in the jail,
said defendant knew that leaving female inmates under the supervision of a
single male detention officer posed an obvious and unreasonable risk of
serious harm to female inmates.

*   *   *

26.   [Sheriff] Pearson failed to provide adequate training and supervision to
defendant Shinn and other detention officers in carrying out a system of
inmate supervision that would protect women from assault, knowing that
such a failure would likely create unreasonable risks of serious injury to
female inmates.

*   *   *

41.   Defendant Shinn had been charged with and entered guilty pleas to five counts
of felony burglary in November 2013. He was given a 5-year deferred
sentence on these charges.

42.   The felony charges and guilty pleas were a matter of public record.

43.   Defendants Pearson, [Muskogee] County, and Muskogee County Sheriff's

Department either knew of the charges and the guilty pleas before the hiring of defendant Shinn as a … detention officer, or failed to undertake an adequate background check of defendant Shinn.

44. During defendant Shinn's employment as a detention officer, defendants Pearson, [Muskogee] County, and Muskogee County Sheriff's Department took no steps whatsoever to provide defendant Shinn with any additional or special training or supervision in view of his recent and admitted felony criminal conduct.

45. Defendant Shinn's commission of a crime as an employee within the Muskogee City-County Jail was a foreseeable consequence of his recent past criminal conduct and the defendants' failure to provide appropriate special or enhanced training and supervision.

                                   *    *    *

48. Defendant Shinn was charged with Second Degree Rape for the rape of the plaintiff, and said defendant pled guilty to that charge on September 27, 2016.

49. It is admitted and determined by law that defendant Shinn unlawfully sexually assaulted and battered a female person who was legally incapable of giving consent.

**[Case No. 17-CV-002-JHP, pp. 4-7, ¶¶ 13-24 & 26; pp. 10-11, ¶¶ 41-45, 48 & 49]**

166. Another case was filed in this Court against MCS on behalf of David Cody Lynch, an individual who died in April 2015 while being arrested by MCS Deputy Derek Apple (along with three other police officers from two other agencies). **[Case No. 16-CV-247-JHP]** In that case, the plaintiff produced substantial evidence that:

a. the Muskogee County Sheriff is the final policymaker for Muskogee County regarding the use of force by MCS employees **[Case No. 16-CV-247-JHP, Dkt. #159, p. 21, ¶ 100; Dkt. #144-1, 54:19 - 55:5]**;

b. MCS is responsible for the administration of the policies, procedures, and practices of the MCS deputies and employees, including policies regarding the use of force **[Case No. 16-CV-247-JHP, Dkt. #159, p. 22, ¶ 103; Dkt. #144-2, 90:20 - 91:6]**;

c. MCS deputies in the field and MCJ detention officers both operated under, and were subject to, the same standards regarding use of force and report writing **[Case No. 16-**

**CV-247-JHP, Dkt. #159, p. 22, ¶ 104; Dkt. #144-2, 22:8-12; 90:4-13]**;

d.  MCS has a long-standing culture and practice of disregarding its written policies;

e.  MCJ personnel have been affirmatively trained to engage in unnecessary and excessive force on arrestees and prisoners who pose no threat; and

f.  MCJ personnel have been trained to maintain secrecy and/or to falsify reports regarding such abuses. **[*See* Case No. 16-CV-247-JHP, Dkt. #159, p. 22, ¶ 105; Dkt. #174-1 - Dkt. #147-7]**

167.  On September 6, 2019, the U.S. Court of Appeals for the Tenth Circuit reversed the district court's order granting summary judgment, and expressly found that the plaintiffs in *Lynch* had provided sufficient evidence from which "[a] reasonable jury could find [MCS Deputy] used excessive force," and that based on the evidence presented, "[i]t would be reasonable to conclude that **the officers [including MCS Deputy Apple] acted in bad faith** when **they did not immediately render medical assistance**."[3] (Emphasis added) **[*See* Case No. 16-CV-247-JHP, Dkt. #242, pp. 11-13 & 22]**

168.  As stated, *supra*, upon information and belief, Guthrie was brutally assaulted by one or more MCJ inmates and/or detention officers on or about January 3, 2020, following his return from SFH.

169.  Plainly, the unconstitutional conditions in place at MCJ while under the supervision of Barnes and Brown did not abate after their indictment.

---

[3]    In *Lynch*, Apple was purportedly trained to recognize when CPR needs to be administered, but nevertheless failed to begin immediately giving CPR to the unconscious arrestee (who Apple had already inferred was in need of immediate medical attention).  Cases alleging Eighth and/or Fourteenth Amendment violations based on similar facts have found that the officer in question acted with deliberate indifference in failing to respond sooner. *See, e.g., Lemire v. California Dep't of Corr. and Rehabilitation*, 726 F.3d 1062, 1083 (9th Cir. 2013) (holding that "[w]hile the failure to provide CPR to a prisoner in need does not create an automatic basis for liability in all circumstances, a trier of fact could conclude that, looking at the full context of the situation, officers trained to administer CPR who nonetheless did not do so despite an obvious need demonstrated the deliberate indifference required for an Eighth Amendment claim").

170. Upon information and belief, there is a causal link between Guthrie's constitutional injuries and the above-described policies, customs, and practices regarding use of force.

171. MSC/County knew of, or should have known of, excessive risks to the health and safety of inmates/detainees like Guthrie, but failed to take reasonable measures to alleviate those risks.

172. Moreover, the deliberate indifference to Guthrie's serious medical needs, as summarized above, was in furtherance of, and consistent with, the policies, customs, and practices that MCS/ County had previously created, implemented, observed, maintained, and/or tolerated (or in which MCS/County had otherwise previously acquiesced).

173. Whether formal or informal, such policies, customs, and practices were well-settled and permanent.

174. MCS/County has failed to provide MCJ employees with sufficient training regarding the proper care for, and supervision of, inmates/detainees with complex or serious medical needs, including Guthrie; thus, MCS/County has acted with deliberate indifference to the health and safety of such inmates/detainees.

175. For instance, according to the *Amended Complaint* filed in this Court on October 24, 2016, by Christopher D-Wayne Young (an individual who MCS arrested on or about July 18, 2015):

> 29. At the time of his arrest, [Young] suffered from a wound to his foot, for which surgery was necessary in order for [Young] to regain proper use and function of his foot.
>
> 30. Following his arrest, [Young] was detained at the Muskogee County Jail, where he failed to receive adequate medical care.
>
> 31. During his detention, [Young] repeatedly requested medical care for his foot, and he missed opportunities he otherwise would have had to obtain medical care that would have restored function to his foot.
>
> 32. In response to his many requests, [Young] was denied medical care.
>
> 33. The Muskogee County Sheriff engages in a policy or custom of restriction of medical care to inmates and/or pretrial detainees, and a policy of denial of

medical care to inmates and/or pretrial detainees requesting medical attention, thereby demonstrating a deliberate indifference to the rights of such inmates and/or detainees.

34. As a result of the actions of Defendants [Charles Pearson/Muskogee County Sheriff and Reserve Deputy John Sandersfield], [Young] suffered not only a violation of his constitutional rights, but permanent physical injury and disability that is directly and proximately caused by the violation of his rights[.]

**[Case No. 16-CV-399-JHP, Dkt. #18, p. 5, ¶¶ 29-34]**

176. On August 25, 2016, a similar complaint against MCJ was made by inmate Charles Conard, according to whom MCJ staff knowingly disregarded "doctor's orders to follow proper protocol pertaining [to] my diabetes, [the neglect of which] has medically put me into constant position to have a diabetic seizure/diabetic coma, which I've experienced on numerous occasions." **[Case No. 16-CV-342-RAW, Dkt. #6, p. 4, ¶ D(1)(a)(2); and p. 7]**

177. In another case, a man named Michael Edwin Smith encountered deliberate indifference to his serious medical needs at MCJ in the summer of 2016. **[*See* Case No. 17-CV-090-RAW]**

178. According to his *Second Amended Complaint,* Smith became permanently paralyzed when jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling.  Cancer spread to Smith's spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. **[*See* Case No. 17-CV-090-RAW, Dkt. #51, p. 6, ¶ 20; p. 8, ¶ 37; pp. 10-11, ¶¶ 47-53]**

179. Smith asserts that he told the physician employed at the jail that he was paralyzed, but the physician, displaying deliberate indifference towards Smith urgent medical needs, laughed at Smith and told him he was faking.  For the next week (before Smith was able to bond out of jail), Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own, and forced to lay in his own urine.

6:21-cv-00306-JFH-GLJ   Document 25   Filed in ED/OK on 12/27/21   Page 37 of 50

**[*See* Case No. 17-CV-090-RAW, Dkt. #51, pp. 11-13, ¶¶ 55-59]**

180. Similarly, for several days in November 2016, the complaints and medical history of
inmate James Douglas Buchanan were disregarded by MCS/County (among others). **[*See*
Case No. 18-CV-171-JFH, Dkt. #25]**

181. According to Buchanan's *Amended Complaint*, spinal surgeon Clinton Baird, M.D., noted
the following:

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history…
> [H]e was involved in being struck by a car while riding bicycle several weeks ago.
> … He ended up finding himself in jail and it was during this time in jail that he had
> very significant clinical deterioration in his neurologic status.  [I]t is obvious that
> he likely developed the beginnings of cervical epidural abscess infection in result
> of his critical illness [and] hospitalization, but then **while in <u>jail</u>, he deteriorated
> significantly and his <u>clinical</u> <u>deterioration</u> <u>went</u> <u>unrecognized</u> <u>and</u> <u>untreated</u>
> until he was nearly completely quadriplegic.**

**[Case No. 18-CV-171-JFH, Dkt. #25, p. 8, ¶ 31; *see also* pp. 11-15, ¶¶ 49-69]**

182. Further, as summarized in Buchanan's *Amended Complaint* (and supported therein by
specific factual allegations):

> The deliberate indifference to Mr. Buchanan's serious medical needs … was in
> furtherance of and consistent with policies, customs and/or practices which
> [Muskogee County/Muskogee County Sheriff] and Turn Key [Health Clinics, LLC]
> promulgated, created, implemented or possessed responsibility for the continued
> operation of … [including] understaffing … Muskogee County Jail with
> undertrained and underqualified medical personnel who are ill-equipped to
> evaluate, assess, supervise, monitor, or treat inmates, like Mr. Buchanan, with
> complex and serious medical needs.
>
> In addition, [the Muskogee County Sheriff] has utterly failed to train its detention
> staff in how to properly care for or supervise inmates, like Mr. Buchanan, with
> complex or serious medical needs, with deliberate indifference to the health and
> safety of those inmates.

**[Case No. 18-CV-171-JFH, Dkt. #25, p. 9, ¶¶ 33, 36 & 37; *see also* pp. 4-15, ¶¶ 13-
32, 34, 35 & 38-69 (incorporated herein by reference)]**

183. According to another lawsuit filed on May 28, 2021, MCS was deliberately indifferent to
the serious medical needs of inmate Renee Rhine, who, among other things, "was brutally
beaten and physically assaulted by a [Muskogee County Sheriff] jailer" in a manner that

"was utterly disproportionate to any legitimate interest in managing the jail," causing her to suffer "multiple serious injuries, including contusions, bruising, a ruptured spleen, and hemoperitoneum." **[*See* Case No. 21-CV-158-PRW, Dkt. #2, pp. 2-7 ¶¶8-40; pp. 10-13, ¶¶ 59-78]**

184. According to the *Complaint* in the case filed on behalf of Rhine's estate:

     24.    After Ms. Rhine was assaulted by the MCSO officer, she should have been immediately transported to a hospital.  She was not. Rather, in deliberate indifference to Ms. Rhine's serious medical needs, she was not transported to a hospital and was not provided with any medical attention whatsoever.

     25.    After being assaulted, Ms. Rhine complained to detention staff and [jail] medical staff at the Jail that she was in extreme pain, that she was bruised and that she was feeling dizzy or nauseous.  On information and belief, Ms. Rhine exhibited signs of mental confusion.  In addition,Ms. Rhine was clearly unable to walk or stand.  She was in and out of consciousness.  At one pointon or about June 1, Ms. Rhine completely lost her balance and fell at the Jail.  Though more than one [Muskogee County Sheriff] employee was present and witnessed Ms. Rhine fall, they did nothing to help her.

     26.    Ms. Rhine's condition, due to injuries from the assault, loss of a consciousness and fall wasan emergent situation requiring immediate transfer to a hospital. However, [Muskogee County Sheriff] detention staff and [jail] medical staff alike were deliberately indifferent to the obvious and substantial risksto Ms. Rhine's health and safety.    She was provided with no medical attention or assistance at all.

     27.    On information and belief, from the time that Ms. Rhine was assaulted and fell on June 1, 2017, to the time that she left the Jail at approximately 12:00 p.m. on June 2, 2017, she was disorientated, unsteady on her feet, confused, visibly injured and in obvious and extreme pain.

     28.    On information and belief, from the time that Ms. Rhine was assaulted and fell on June 1, 2017, to the time that she left the Jail at approximately 12:00 p.m. on June 2, 2017, she continually complained to [Muskogee County Sheriff] detention staff and [jail] medical staff that she had been assaulted, was in extreme pain and needed medical attention.

     29.    On information and belief, from the time that Ms. Rhine was assaulted and fell on June 1, 2017, to the time that she left the Jail at approximately 12:00 p.m. on June 2, 2017, the [Muskogee County Sheriff] detention staff and [jail] medical staff [who] came into contact with Ms. Rhine were deliberately indifferent to her serious medical needs by failing and refusing to provide her with any medical assistance, attention or referral.

* * *

39.    The excessive use of force and deliberate indifference to Ms. Rhine's serious medical needs, as described herein, were a proximate cause of her physical and mental pain and suffering, a worsening of her condition, and ultimately, her death.

40.    The excessive use of violent force, as summarized *supra*, was in furtherance of and consistent with policies, customs and/or practices for which [Muskogee County/Muskogee County Sheriff] promulgated, created, implemented or possessed responsibility for the continued operation of.

**[Case No. 21-CV-158-PRW, Dkt. #2, pp. 5-7 ¶¶ 21-40]**

185.    The *Complaint* in the Rhine matter goes on to summarize the "long and deep-seated history of an unabated custom of excessive force at the Muskogee County Jail." **[Case No. 21-CV-158-PRW, Dkt. #2, pp. 7-8 ¶¶ 41-48]**

186.    The prior instances of unconstitutional mistreatment put MCS/County on notice that MCJ administrators, supervisors, detention officers, medical staff, and other personnel were inadequately trained, that MCJ detention workers subjected inmates to unnecessary and constitutionally-excessive force, and that the medical care and inmate supervision provided by MCJ workers was wholly inadequate, thus placing inmates like Guthrie at excessive risk of harm.

187.    MCS/County, however, in deliberate indifference to the rights of inmates like Guthrie, failed to alleviate the above-referenced risks, which were known and obvious.

188.    On or about July 9, 2020, and pursuant to 51 O.S. § 156, Plaintiffs timely filed a Notice of Claim within one year of the date on which the loss occurred (i.e., approximately April 4, 2015), serving copies of the same on the office of the clerk for each of the following entities BOCC, Muskogee County Sheriff, and Muskogee County clerk and were notified by separate letter on February 20, 2020, to preserve evidence surrounding this incident and of the impending potential tort claim.

**FIRST CAUSE OF ACTION**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**
**IN VIOLATION OF THE FOURTEENTH AMENDMENT**
**TO THE CONSTITUTION OF THE UNITED STATES**
**(42 U.S.C. § 1983)**

For her First Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

189.   The individual Defendants (including those who observed Guthrie remotely, those who were responsible for such observation, and those who came into direct contact with Guthrie), as described herein, knew that delays in treating Guthrie's serious medical needs, and/or the denial of any such treatment, would likely expose Guthrie to a substantial risk of serious harm.

190.   Such knowledge on the part of the individual Defendants resulted from their awareness of, *inter alia*, the brutal assault upon Guthrie that took place on the morning of January 3, 2020 (which required Guthrie to be taken to the hospital), Guthrie's subsequent treatment at SFH later that morning, the strict instructions issued by SFH upon Guthrie's discharge specifying the care, observation, and treatment that Guthrie would require upon his return to MCJ, Guthrie's repeated requests (which were made following his return to MCJ) to be taken back to the doctor, Guthrie's outward display of extreme and ever-increasing mental confusion and incoherence, Guthrie's obvious difficulty walking (which, as it progressed, ultimately resulted in his total inability to stand or walk), his ever-increasing, demonstrated need for assistance with the simplest of tasks, his repeated losses of consciousness, the repeated discovery of Guthrie helpless on the floor of his cell, Guthrie's decorticate posture, and/or the sharp deterioration of his overall condition, which was outwardly apparent).

191. As detailed hereinabove, given the outward manifestation of Guthrie's distress and deterioration, his medical needs were so obvious to the individual Defendants that even a lay person would have easily recognized the necessity for a doctor's attention.

192. As detailed hereinabove, the individual Defendants -- intentionally and/or despite their knowledge of a substantial risk of serious harm -- denied and/or delayed Guthrie's access to medical care, interfered with the care and treatment that Guthrie had been prescribed, failed to take reasonable measures to abate the substantial risk of harm known to them, and/or otherwise failed to act.

193. Given their knowledge of a substantial risk of serious harm, the above-referenced failures on the part of the individual Defendants amount to more than an ordinary lack of care or simple negligence.

194. The individual Defendants' failure to meet Guthrie's objective medical needs, their delay in meeting such needs, their interference with the care and treatment that Guthrie had been prescribed, and/or their failure to take reasonable measures to abate what they knew to be a substantial risk of harm to Guthrie directly and proximately caused Guthrie to suffer substantial harm.

195. The individual Defendants' failure to meet Guthrie's objective medical needs, their delay in meeting such needs, their interference with the care and treatment that Guthrie had been prescribed, and/or their failure to take reasonable measures to abate what they knew to be a substantial risk of harm to Guthrie amounted to the deprivation of Guthrie's constitutional rights.

196. Plaintiff, therefore, is entitled to recover pecuniary and compensatory damages.

197. Additionally or alternatively, by denying and/or delaying Guthrie's access to medical care,

interfering with the care and treatment that Guthrie had been prescribed, failing to take reasonable measures to abate what they knew to be a substantial risk of harm to Guthrie, and/or otherwise failing to provide or facilitate the above-referenced care and treatment, the individual Defendants acted maliciously, sadistically, and/or for the very purpose of causing harm to Guthrie.

**WHEREFORE**, premises considered, Plaintiff Lorena Sanchez prays for judgment against the individual Defendants for all available damages (including pecuniary, non-economic, and punitive damages) in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case.  Plaintiff also prays for pre-judgment interest, attorney fees, and the costs of this action, to be taxed against the individual Defendants, along with an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**DELIBERATE INDIFFERENCE TO PLAINTIFF'S HEALTH AND SAFETY**
**IN VIOLATION OF THE FOURTEENTH AMENDMENT**
**TO THE CONSTITUTION OF THE UNITED STATES**
**(42 U.S.C. § 1983)**

For her Second Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

198.  The individual Defendants (including those who observed Guthrie remotely, those who were responsible for such observation, and those who came into direct contact with Guthrie) had an obligation to take reasonable measures to guarantee Guthrie's safety.

199.  The above-referenced obligation included a duty to protect Guthrie from violence at the hands of other prisoners, including Perez.

200.  The individual Defendants caused Guthrie to be placed back into the same cell with Perez,

and/or permitted Perez to remain in the same cell as Guthrie, despite knowing that, only hours before, Perez had violently assaulted Guthrie.

201. In so doing, the individual Defendants subjected Guthrie to conditions that posed a substantial and unjustifiably high risk of -- and ultimately resulted in -- serious harm to Guthrie.

202. In particular, upon information and belief, after Guthrie and Perez were placed in the same cell following Guthrie's return to MCJ from SFH, Perez inflicted a second violent assault upon Guthrie.

203. As described hereinabove, the individual Defendants were aware of facts (including, without limitation, Perez's initial, violent assault upon Guthrie, Guthrie's subsequent hospitalization, the need to protect Guthrie from any further head trauma, and Guthrie's weakened state) from which they could have drawn the inference that housing Guthrie and Perez in the same cell would pose a substantial risk of serious harm to Guthrie.

204. Upon information and belief, and in light of the circumstances described hereinabove, the individual Defendants did, in fact, draw the inference that housing Guthrie and Perez in the same cell would pose a substantial risk of serious harm to Guthrie.

205. The individual Defendants -- in the face of an unjustifiably high risk of harm to Guthrie that was known and/or obvious to them -- consciously and/or recklessly disregarded this substantial risk of serious harm by placing Guthrie back into the same cell with Perez, by permitting Perez to remain in the same cell as Guthrie, and/or by failing to separate Guthrie and Perez or otherwise to intervene.

206. Additionally or alternatively, in placing Guthrie back into the same cell with Perez, permitting Perez to remain in the same cell as Guthrie, and/or failing to separate Guthrie

and Perez or otherwise to intervene), the individual Defendants acted maliciously, sadistically, and/or for the very purpose of causing harm to Guthrie.

**WHEREFORE**, premises considered, Plaintiff Lorena Sanchez prays for judgment against Defendants for all available damages (including pecuniary, non-economic, and punitive damages) in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for pre-judgment interest, attorney fees, and the costs of this action, to be taxed against Defendants, along with an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**EXCESSIVE USE OF FORCE**
**IN VIOLATION OF THE FOURTEENTH AMENDMENT**
**TO THE CONSTITUTION OF THE UNITED STATES**
**(42 U.S.C. § 1983)**

For her Third Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

207. At the time of the events upon which Plaintiff's claims are based, Guthrie, as a pretrial detainee, had a clearly-established constitutional right under the Fourteenth Amendment to be secure in his person and free from objectively unreasonable and/or excessive force.

208. Any reasonable officer knew or should have known of Guthrie's above-referenced rights at the time of the events upon which Plaintiff's claims are based, as such rights were clearly established.

209. At the time the violent physical force was used by Defendant(s) Boyd, Hope, Cole, Reyes, and/or one or more unidentified MCJ workers, Guthrie posed no threat or serious physical harm to himself or others, and violent force was unnecessary to restrain Guthrie or to secure

the safety of officers.

210. Accounting for the "legitimate interests [stemming from the government's] need to manage the facility in which the individual is detained, the violent force used on Guthrie was objectively excessive, constitutionally unreasonable, and disproportionate to any legitimate interest in managing MCJ.

211. The excessive force described herein was a direct and proximate cause of Guthrie's unnecessary physical pain, his emergent physical injuries, the worsening of his condition, the severe emotional distress and mental anguish he suffered, and hospital, surgical, and other medical expenses, and ultimately contributed to his death.

**WHEREFORE**, premises considered, Plaintiff Lorena Sanchez prays for judgment against Defendant(s) Boyd, Hope, Cole, Reyes, and/or one or more MCJ worker(s), presently unidentified, for all available damages (including pecuniary, non-economic and punitive damages) in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for pre-judgment interest, attorney fees, and the costs of this action, to be taxed against said Defendants, along with an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
*MONELL* **LIABILITY**
**FOR CONSTITUTIONAL VIOLATIONS**
**(42 U.S.C. § 1983)**

For her Fourth Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

212. The above-referenced constitutional violations to which Guthrie was subjected were in furtherance of, consistent with, and causally connected to the policies, customs, and

45

practices that MCS/County had previously created, implemented, observed, maintained, and/or tolerated (or in which MCS/County had otherwise previously acquiesced).

213.  Such policies, customs, and/or practices include those specifically set forth in ¶¶ 141-144, *supra.*

214.  Whether formal or informal, the aforementioned policies, customs, and practices of MCS/County were well-settled and permanent at the time of the events upon which Plaintiff's claims are based.

215.  Furthermore, the above-referenced constitutional violations to which Guthrie was subjected arose under circumstances that constitute usual and recurring situations with which MCJ administrators, supervisors, detention officers, medical staff, and other personnel must routinely deal and/or have regularly or previously dealt.

216.  MCS/County failed to adequately train, supervise, and/or control the administrators, supervisors, detention officers, medical staff, and other personnel at MCJ regarding their obligations under the Eighth and Fourteenth Amendments to refrain acting with deliberate indifference toward the serious medical needs of MCJ inmates/detainees.

217.  MCS/County failed to adequately train, supervise, and/or control the administrators, supervisors, detention officers, and other personnel at MCJ regarding their obligations under the Eighth and Fourteenth Amendments to protect prisoners, detainees, and other inmates from violence at the hands of other prisoners, detainees, and inmates.

218.  MCS/County failed to adequately train, supervise, and/or control the administrators, supervisors, detention officers, and other personnel at MCJ regarding the proper use of force and/or prohibitions against MCJ personnel using constitutionally-excessive or unreasonable force on MCJ inmates/detainees.

219. MCS/County's failure to adequately train, supervise, and/or control the administrators, supervisors, detention officers, medical staff, and other personnel at MCJ, as stated above, amounts to deliberate indifference to the rights of MCJ inmates and detainees.

220. A direct and causal link exists between the pain and death unnecessarily suffered by Guthrie and the failure to adequately train MCJ's administrators, supervisors, detention officers, medical staff, and other personnel.

221. A direct and causal link exists between the pain and death unnecessarily suffered by Guthrie and the failure to adequately supervise MCJ administrators, supervisors, detention officers, medical staff, and other MCJ personnel.

222. Upon information and belief, MCS/County had contemporaneous knowledge of the above-referenced constitutional violations.

223. As detailed hereinabove, there exists a lengthy pattern of similar constitutional violations by MCJ's inadequately trained and/or inadequately supervised administrators, supervisors, detention officers, medical staff, and other personnel.

224. MCS/County had actual and/or constructive notice that its actions and/or failures to act, as described herein, were substantially certain to result in the violation of the constitutional rights of MCJ inmates/detainees.

225. Moreover, given the above-described history of constitutional violations, which is lengthy and ongoing, the need to provide MCJ's administrators, supervisors, detention officers, medical staff, and other personnel with more and/or different training was obvious to MCS/County, as was the likelihood that the aforementioned inadequacies would result in violations of the constitutional rights of MCJ inmates/detainees.

226. Nevertheless, MCS/County consciously or deliberately chose to disregard the substantial

risk of serious harm to MCJ inmates/detainees.

227. MCS/County, through its continued encouragement, ratification, approval, and/or maintenance of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to the health and safety of MCJ inmates and detainees, including Guthrie.

228. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Guthrie suffered injuries as alleged herein, entitling Plaintiff to recover damages.

**WHEREFORE**, premises considered, Plaintiff Lorena Sanchez prays for judgment against Defendant Muskogee County Sheriff (*i.e.*, Muskogee County) for all available damages (including pecuniary and non-economic damages) in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for pre-judgment interest, attorney fees, and the costs of this action, to be taxed against Defendant MCS/County, along with an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### WRONGFUL DEATH
### (12 O.S. § 1053)

For her Fifth Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

229. Defendants owed a duty of care to Guthrie.

230. Defendants breached their duty of care to Guthrie.

231. Guthrie's death was proximately caused by Defendants' breach of duty, as set forth hereinabove.

232. Guthrie's life had economic value.

233. Guthrie experienced pain and suffering as a direct result of Defendants' breach of duty.

234. Defendants' breach of duty resulted in economic loss to Guthrie's estate.

235. Guthrie's surviving next-of-kin suffered pecuniary and non-economic losses as a result of Defendants' breach of duty.

236. Pursuant to OKLA. STAT. tit. 12 § 1053, Plaintiff is entitled to recover the following damages from Defendants:

    a.  Medical and burial expenses associated with Guthrie's death;

    b.  The mental pain and anguish suffered by Decedent;

    c.  The pecuniary loss to Guthrie's surviving next-of-kin;

    d.  The grief and loss of companionship to which any of Guthrie's surviving next-of-kin may be entitled under OKLA. STAT. tit. 12 § 1053(B)(5).

237. The individual Defendants breached their duty of care in a manner amounting to bad faith, gross negligence, recklessness, deliberate indifference, an intent to harm, and/or willful/wanton misconduct.

238. Pursuant to OKLA. STAT. tit. 12 § 1053(C), Plaintiff is entitled to recover punitive damages from the individual Defendants.

**WHEREFORE**, premises considered, Plaintiff Lorena Sanchez prays for judgment against Defendants for all available pecuniary and non-economic damages, as well as punitive damages (against the individual Defendants only), in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case.  Plaintiff also prays for pre-judgment interest, attorney fees, and the costs of this action, to be taxed against Defendants, along with an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that the Court deems just and proper.

Respectfully submitted:

/s/ Christopher L. Camp
Christopher L. Camp, OBA #18541
CAMP LAW FIRM
7122 South Sheridan Road, Suite #2-382
Tulsa, Oklahoma 74133
Telephone: (918) 200-4871
Facsimile: (918) 340-6799
E-mail: camplawfirm@gmail.com

and

/s/ D. Mitchell Garrett, Jr.
D. Mitchell Garrett, Jr., OBA# 20704
GARRETT LAW
320 South Boston Avenue, Suite 825-G
Tulsa, Oklahoma  74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
E-mail: mitchell@garrett.legal

Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2021, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

Andy A. Artus, Esq.
Jamison C. Whitson, Esq.
W.R. Moon, Jr., Esq.

/s/ Christopher L. Camp